**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>  vs.<br><br>MICHAEL J. MOORE,<br><br>        Defendant. | Case No.: 2:15-cv-1865-LDG-(GWF)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The plaintiff, Securities and Exchange Commission ("SEC") moved for summary judgment on its claims against Defendant Michael J. Moore. The Court reviewed the pleadings, the SEC's motion and memorandum of points and authorities, and the voluminous evidence submitted in support of that motion and found that the SEC had met its burden of showing that it is entitled to summary judgment on each of its claims, and is entitled to the relief requested in its complaint, as set forth in Section D of the memorandum of points and authorities. By Order issued March 31, 2017 (Dkt. No. 17), the Court granted the Motion by Plaintiff Securities and Exchange Commission ("SEC") for Summary Judgment against Defendant Michael J. Moore and issues the following

1

findings of fact and conclusions of law as to the relief to be granted the SEC in this matter:

**I.     FINDINGS OF FACT**

   **A.     The Defendant**

   1.     Michael J. Moore is a resident of Las Vegas, Nevada.  Moore, a former Certified Public Accountant ("CPA"), is the sole owner and managing member of MJ Moore & Company LLC d/b/a X Tax Pros ("X Tax Pros").  (Complaint (Dkt. No. 1) ¶ 6; Answer of Michael J. Moore (Dkt. No. 7) ¶ 6.)

   2.     On September 25, 2009, a final judgment was entered by this Court pursuant to Moore's consent, permanently enjoining Moore and his then-audit firm, Moore & Associates Chartered ("M&A"), from future violations of, among other provisions, the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  *Securities and Exchange Commission v. Michael J. Moore and Moore & Associates Chartered*, Civil Action No. 2:09-cv-01637-LDG-GWF (D. Nev.).  (Dkt. 12-4 (Final Judgment).)

   3.     Moore was licensed as a CPA in both Nevada and Texas, beginning July 19, 2000, and July 3, 1984, respectively.  (Dkt. 12-5 (printout from Nevada State Board of Accountancy website); Dkt 12-6 (printout from Texas State Board of Accountancy website).)  Moore was reprimanded by the Texas State Board of Public Accountancy on July 24, 1990 for practicing without a license.  (Dkt. 12-6.)  Moore's Texas CPA license was revoked on August 18, 1992.  (Dkt. 12-6.)  On May 15, 2003, Moore's Texas CPA license was reinstated.  (Dkt. 12-6.)  Following entry of the injunctive order in *SEC v. Moore* in 2009, Moore's Nevada CPA license was revoked on November 20, 2009, and his Texas CPA license was revoked on July 22, 2010.  (Dkt. 12-5; Dkt. 12-6; Dkt. 12-8 (Moore Testimony ("Test.")) 42:13-43:4.)

   4.     On August 9, 1996, Moore was convicted of one count of mail fraud, pursuant to his guilty plea.  *United States of America v. Moore*, CR 94-580-01 (D.N.J.).  (Dkt. 12-7 (Judgment).)

   **B.     Moore Was Suspended by the SEC and Barred by the PCAOB**

   5.     On October 6, 2009, the SEC issued an order (the "SEC Order") permanently

2

suspending both Moore and M&A from appearing or practicing before the SEC as accountants based on the entry of the permanent injunction against them. *In the Matter of Michael J. Moore, CPA and Moore & Associates Chartered*, SEC AP File No. 3-13640, 2009 SEC LEXIS 3714 (October 6, 2009). (Dkt. 12-9 (SEC Order) ¶¶ III.3, III.4 & IV.)

6. The Public Company Accounting Oversight Board ("PCAOB") entered an order on August 27, 2009, against M&A and Moore. (Dkt. 12-10 (PCAOB Order).) The PCAOB Order revoked M&A's registration as a public accounting firm and barred Moore from being an associated person of any public accounting firm registered with the PCAOB. (*Id.* at 18 ¶ IV.B.)

**C.  Moore Provided Services to Public Companies after Issuance of the Orders**

7. After the SEC and PCAOB Orders were issued, Moore provided services to two SEC-reporting public companies, Cytta Corp. and Monkey Rock Group, Inc. (Dkt. 12-8 (Moore Test.) 86:23-87:9, 90:2-90:5, 92:14-93:6 (Cytta) & 83:15-84:4 (Monkey Rock); Dkt. 12-43 (Moore Deposition ("Depo.")) 15:25-16:18 (Cytta) & 21:22-22:14 (Monkey Rock).)

**1.  Moore Provided Services to Cytta**

8. Moore's services for Cytta from February 2010 to September 2014 included:

   a. Participating in the preparation of data for inclusion in Cytta's financial statements to be filed with the SEC by maintaining Cytta's cash receipts and cash disbursement journals and its general ledger. Dkt. 12-8 (Moore Test.) 104:18-105:3, 105:15-105:17; Dkt. 12-43 (Moore Depo.) 15:25-16:18, 33:13-33:17; Dkt. 12-12 (Campbell Test.) 15:20-16:25, 98:15-99:3, 136:7-136:11; Dkt. 12-41 (Shelley Test.) 20:23-22:8.)[1]

   b. Preparing Cytta's financial statements, including balance sheets, statements of operations, statements of stockholders' equity, and statements of cash flows,

---

[1] Gary Malcolm Campbell was Cytta's CEO and CFO and a director. Mark Shelley was Cytta's auditor until March 2015. (Dkt. 12-12 (Campbell Test.) at 71:12-71:19; Dkt. 12-41 (Shelley Test.) at 16:12-16:23.)

3

which Cytta included in its quarterly and annual reports on Forms 10-Q and 10-K filed with the SEC. (Dkt. 12-8 (Moore Test.) 106:21-107:1, 108:20-109:8, 122:25-123:9, 123:13-124:1; Dkt. 12-43 (Moore Depo.) 60:4-60:19, 64:7-64:17, 72:6-72:17; Dkt. 12-12 (Campbell Test.) 15:10-15:19, 17:10-17:24, 125:17-127:19, 128:4-129:10, 136:7-136:11; Dkt. 12-14 (Cytta Corp's September 30, 2013 and 2012 Financial Statements and Audit Report); Dkt. 12-15 (Cytta's September 30, 2012 and September 30, 2011 Financial Statements).)

c. Drafting and editing footnotes to financial statements for Cytta, which Cytta included in its quarterly and annual reports on Forms 10-Q and 10-K filed with the SEC. (Dkt. 12-8 (Moore Test.) 108:20-109:8, 117:19-119:25, 121:21-121:24, 122:25-123:9, 123:13-124:1, 124:9-124:22, 166:11-167:10; Dkt. 12-43 (Moore Depo.) 60:4-60:19, 64:7-65:13; Dkt. 12-12 (Campbell Test.) 15:10-15:19, 17:10-19:6, 136:7-136:11; Dkt. 12-20 (Cytta's March 31, 2014 and September 30, 2013 Financial Statements); Dkt. 12-21 (Cytta's March 31, 2011 and September 30, 2010 Financial Statements); Dkt. 12-41 (Shelley Test.) 23:19-23:24, 24:17-19.)

d. Interacting with Cytta's external auditor, including providing the auditor with Cytta's financial statements and footnote disclosures to be included in Cytta's quarterly and annual reports on Forms 10-Q and 10-K, together with supporting documentation and schedules such as equity roll-forward schedules; responding to the auditor's questions; and signing confirmations circulated by the auditor. (Dkt. 12-8 (Moore Test.) 109:9-110:5, 111:1-113:16, 123:13-124:1, 125:6-125:13, 128:4-129:16, 132:10-133:3; Dkt. 12-43 (Moore Depo.) 57:13-61:13, 66:16-69:14, 71:9-72:5; Dkt. 12-12 (Campbell Test.) 19:14-20:4, 127:12-127:19, 131:7-131:22, 147:4-147:19; Dkt. 12-15 (Cytta's September 30, 2012 and September 30, 2011 Financial Statements); Dkt. 12-18 (May 2014 emails

between Moore, Shelley, and Campbell,); Dkt. 12-19 (Cytta confirmations signed by Moore); Dkt. 12-41 (Shelley Test.) 16:19-17:8, 19:1-19:17, 20:3-20:11, 20:23-21:7, 23:19-23:24, 24:17-24:19, 24:25-25:14, 29:1-29:20, 29:24:30:14, 32:14-34:24, 51:19-53:8, 66:21-68:23, 69:2-79:24, 80:13-81:25, 83:16-84:21, 85:5-86:15, 90:3-91:12; Dkts. 12-24 to 12-34 (email exchanges between Moore and Shelley and, in some cases, Campbell).)

    e. Working with Cytta's EDGAR filing service, including forwarding financial statements for inclusion in reports to be filed with the SEC and making corrections to tables in the financial statement footnotes at the request of Cytta's EDGAR filing service. (Dkts. 12-16, 12-17, 12-31, 12-33 & 12-42 (emails between Abby Lord, Campbell and Moore); Dkt. 12-8 (Moore Test.) 134:15-135:18; Dkt. 12-43 (Moore Depo.) 61:17-63:23; Dkt. 12-12 (Campbell Test.) 20:5-20:22, 140:17-141:14.)

    f. Holding himself out as Cytta's controller. (Dkt. 12-58 (Moore Declaration).) (*See also* Dkt. 12-11 (Cytta invoices and payment receipts).)

9. The securities of Cytta were registered with the SEC, said registration effective January 10, 2007. (Dkt. 12-36 (SEC Attestation).) Cytta filed periodic reports with the SEC, including quarterly reports on Form 10-Q and annual reports on Form 10-K during the period from February 2010 to September 2014, the period of time during which Moore provided services to Cytta. (Dkt. 12-37 (printout of EDGAR company filings); Dkt. 12-11 (Cytta invoices and payment receipts).)

### 2. Moore Provided Services to Monkey Rock

10. Moore also functioned as Monkey Rock's accounting department from June 2011 to January 2012. (Dkt. 12-8 (Moore Test.) 83:15-84:4, 138:15-138:25; Dkt. 12-43 (Moore Depo.) 18:10-18:24, 20:13-22:14, 26:13-28:24; Dkt. 12-13 (Monkey Rock invoices and payment receipts).) Among other things, Moore prepared, maintained, and/or supervised the preparation of various documents and schedules for Monkey Rock. In particular, Moore:

|   |   |     |                                                                                         |
|---|---|-----|-----------------------------------------------------------------------------------------|
| 1 |   | a.  | Maintained Monkey Rock's general ledger. (Dkt. 12-43 (Moore Depo.) 28:2-28:24.)         |
| 2 |   | b.  | Prepared a schedule showing issuance of shares of common stock. (Dkt. 12-43 (Moore Depo.) 34:21-37:1; Dkt. 12-44.) |
| 3 |   | c.  | Prepared a schedule showing depreciation of company assets. (Dkt. 12-43 (Moore Depo.) 38:7-39:15; Dkt. 12-45.) |

a. Maintained Monkey Rock's general ledger. (Dkt. 12-43 (Moore Depo.) 28:2-28:24.)

b. Prepared a schedule showing issuance of shares of common stock. (Dkt. 12-43 (Moore Depo.) 34:21-37:1; Dkt. 12-44.)

c. Prepared a schedule showing depreciation of company assets. (Dkt. 12-43 (Moore Depo.) 38:7-39:15; Dkt. 12-45.)

d. Prepared schedules showing debt owed to a principal Monkey Rock creditor. (Dkt. 12-43 (Moore Depo.) 42:14-43:4, 46:13-47:9; Dkts. 12-46 & 12-47.)

e. Prepared a trial balance by account for 2009. (Dkt. 12-43 (Moore Depo.) 49:2-49:22; Dkt. 12-48.)

f. Prepared a trial balance by account for 2010. (Dkt. 12-43 (Moore Depo.) 49:2-49:22; Dkt. 12-48.)

g. Prepared a trial balance summary for 2009. (Dkt. 12-43 (Moore Depo.) 50:2-51:5; Dkt. 12-49.)

h. Prepared a trial balance summary for 2010. (Dkt. 12-43 (Moore Depo.) 50-2:51:5; Dkt. 12-49.)

i. Drafted annual financial statements and footnote disclosures for inclusion in Monkey Rock's 2010 annual filing with the SEC on Form 10-K. (Dkt. 12-43 (Moore Depo.) 21:22-22:14, 51:6-52:10, 54:18-55:4; Dkt. 12-50 (10-K); Dkts. 12-52 & 12-53 (footnotes).)

j. Drafted quarterly financial statements and footnote disclosures for inclusion in Monkey Rock's first quarter 2011 filing with the SEC on Form 10-Q. (Dkt. 12-43 (Moore Depo.) 21:22-22:14; Dkt. 12-51 (10-Q).)

11. Moore also interacted with Monkey Rock's external auditor, including providing the auditor with Monkey Rock's financial statements and footnote disclosures. (Dkt. 12-8 (Moore Test.) 83:15-84:4, 136:23-138:5, 140:19-141:20; Dkt. 12-22 (May 24, 2011 letter from Moore to Monkey

Rock); Dkt. 12-23 (Monkey Rock's Notes to Financial Statements dated November 30, 2009); Dkt. 12-43 (Moore Depo.) 20:13-22:14, 25:13-26:12.)

12. The securities of Monkey Rock were registered under Section 12 of the Exchange Act from October 12, 1999 until Monkey Rock terminated its registration on February 25, 2015. (Dkt. 12-38 (SEC Attestation).)

13. Monkey Rock filed an annual report on Form 10-K for the fiscal year ended December 31, 2010, and a quarterly report on Form 10-Q for the quarter ended March 31, 2011 during the period in which Moore provided Monkey Rock with accounting services. (Dkt. 12-39 (printout of EDGAR company filings); Dkt. 12-13 (Monkey Rock invoices and payment receipts).)

14. The SEC did not consent to Moore becoming or remaining associated with Monkey Rock. (Dkt. 12-2 (Moser Dec.) ¶ 38.)

15. The PCAOB did not consent to Moore becoming or remaining associated with Monkey Rock. (Dkt. 12-2 (Moser Dec.) ¶ 39; Dkt. 12-40 (PCAOB website printout listing "Termination of Bars").)

### 3. Moore Received $168,612.30 for Providing Services to Cytta and Monkey Rock

16. Moore has received $168,612.30 in the form of payments by Cytta ($159,612.30) and Monkey Rock ($9,000) for his services. (Dkt. 12-2 (Moser Dec.) ¶¶ 9 &11; Dkt. 12-11 (Cytta invoices and payment receipts); Dkt. 12-13 (Monkey Rock invoices and payment receipts).) Prejudgment interest on $168,612.30 through April 30, 2016 is $9,650.90. (Dkt. 12-2 (Moser Dec.) ¶¶ 56-57.)

### D. Moore Knowingly Violated this Court's Final Judgment

17. Pursuant to Final Judgment entered by this Court on September 25, 2009, Moore was required to pay disgorgement and prejudgment interest totaling $189,901.59 as well as to pay a $130,000 civil penalty, totaling $319,901.59, within ten business days after entry of the Final Judgment. (Dkt. 12-4 (Final Judgment) at 4:15-5:19 (¶¶ V. & VI.).)

18. The parties agreed that, pending approval of the settlement by the SEC, the

7

$319,901.59 would be held by Moore's then counsel, Ronald Neil Serota ("Serota"), in his attorney trust account. (Dkts. 12-54 & 12-55 (Escrow Agreements).)

19. Serota stole the funds. (Dkt. 12-56 (State Bar correspondence); Dkt. 12-43 (Moore Depo.) 74:13-74:19.)

20. Moore then applied to the State Bar Clients' Security Fund Committee for reimbursement of the monies Serota misappropriated, and obtained partial reimbursement of $50,000. (Dkt. 12-56 (State Bar correspondence); Dkt. 12-43 (Moore Depo.) 74:20-75:2.)

21. When Moore received the $50,000 check from the Nevada State Bar, he understood that the $320,000 which had been escrowed with Serota was to pay the SEC after a Final Judgment was entered. (Dkt. 12-43 (Moore Depo.) 75:3-75:5.)

22. Moore did not pay the $50,000 he received from the State Bar to the SEC even though he understood that he had agreed to pay the $320,000 for which the $50,000 was partial reimbursement, and that he was personally obligated by the Final Judgment to pay to the SEC the monies he had escrowed with his attorney. (*Id.* 75:6-76:4.) Moore did not pay the SEC, even though "There's no argument that I did agree to pay it," because, in his view, "The honest truth is I never thought I should have paid the 320- to start with. So I didn't really think like I owed anybody any money anyway." (*Id.* 75:10-75:13.)

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. This Court has jurisdiction over this action pursuant to Sections 21(d)(3), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(3), 78u(e) & 78aa(a), and Section 3(b)(1) of the Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7202(b)(1).

2. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because the defendant resides in and/or transacts business in this district, and certain of the transactions, practices and courses of business constituting violations of the federal securities laws occurred within this district.

**B.	The Legal Standard for Summary Judgment**

3.	Summary judgment is appropriate when the cited materials in the record demonstrate that there is no genuine issue of material fact, and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a) & (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of identifying the evidence that demonstrates the absence of any material fact. *See Celotex*, 477 U.S. at 323. Once the movant has met its burden, the nonmoving party may not rest on conclusory allegations, but must come forward with significant probative evidence tending to support its claim that material, triable issue of fact remain. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Therefore, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

4.	The Court finds that the SEC has met its burden of showing that it is entitled to summary judgment on each of its claims.

**C.	Moore Violated the SEC Order**

5.	Moore was suspended from appearing or practicing before the SEC as an accountant by the October 6, 2009 SEC Order. Rule 102(f) of the SEC's Rules of Practice broadly defines "practicing before the Commission" to include "the preparation of any statement, opinion or other paper by any . . . accountant . . . filed with the Commission in any registration statement, notification, application, or other document with the consent of such . . . accountant." 17 C.F.R. § 201.102(f). The SEC has provided additional guidance as to what constitutes "practicing" before it, stating that:

> The text of [Rule 102(f)] does not specify that a person must sign a document filed with the Commission. Moreover, the term "preparation" of a document is, we believe, sufficiently broad to encompass the preparation of data to be included in a

9

> document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document…. [Rule 102] recognizes that financial statements often incorporate information created, compiled, or edited by accountants who are not responsible for signing or filing the financial statements. Thus, practicing before the Commission includes computing the figures and supplying the data incorporated into Commission filings and consenting to their incorporation.

*In the Matter of Robert W. Armstrong, III*, 2005 SEC LEXIS 1497 at * 46-47 (June 24, 2005).

6. Courts have also addressed what constitutes "practice before the Commission." In *SEC v. Brown*, the district court held that an "individual may . . . be found to have practiced before the Commission if he or she participated in the preparation of financial statements filed with the Commission by, for example, creating, compiling or editing information or data incorporated into [filings with the SEC] and consenting to their incorporation." *SEC v. Brown*, 878 F. Supp. 2d 109, 125 (D.D.C. 2012). And, in *SEC v. Prince*, the court held that "preparation" includes "the preparation of data to be included in a document filed with the Commission, at least where the data was prepared for the express purpose of being included in such a document." *Prince*, 942 F. Supp. 2d 108, 150 (D.D.C. 2013).

7. The *Prince* court determined that for purposes of analysis, a violation of a Rule 102(e) order requires two elements. First, an individual must appear or practice as an accountant. Second, the action must have occurred before the SEC. *Prince*, 942 F. Supp. 2d at 145-46. Scienter is not required. *Id.* at 145-46 & 151.

8. With respect to the first element, the court rejected Prince's argument that practicing as an accountant excluded reviewing and deciding on accounting treatments unless done by someone who had "final authority" to implement the suggestion. *Id.* at 147. The court stated that this "cramped definition ignores the language and spirit of *Armstrong*, which rejected the premise that only those who were 'responsible for signing or filing the financial statements' were practicing accounting." *Id.* The court found there was substantial evidence of Prince "practicing accounting" under the "'creating, compiling, or editing'" standard set forth in *Armstrong*. *Id.* at 148 & n.25.

9. With respect to the second element, the court found that Prince's activities, which included reviewing and commenting on drafts of public filings such as Forms 10-K and engaging in discussions with accounting staff regarding the company's financial statements "clearly meet the second prong in that they involve work done on various types of statements and documents 'filed with the Commission.'" *Id.* at 146 (citing Rule 102(f)(2)).

In *SEC v. Jones*, the court stated:

> Rule 102(e) and 102(f) and the *Armstrong* and *Prince* cases illustrate the breadth of what qualifies as practicing before the Commission, including creating, compiling, or editing information or data incorporated into filings with the SEC; participating in non-quantitative accounting decisions; and implementing GAAP and FASB standards. And such work qualifies, regardless of whether an individual actually signs the documents filed with the SEC or has final decision making authority over them.

2015 U.S. Dist. LEXIS 134219, at *18 (D. Utah Sept. 30, 2015). In *Jones*, the court concluded that defendant had violated a Rule 102(e) order, finding that "personal participation in the preparation of public company financial statements and related disclosures filed with the SEC squarely qualifies as practicing before the Commission." *Id.*, at *23-24. The court also concluded that the defendant in *Jones* consented for purposes of Rule 102(f) "because he prepared materials for public companies with the understanding and expectation that such information would be included in SEC filings." *Id*. at *37-40 (finding consent based on email subject lines).

10. It is the nature of the services Moore provided, not the description Moore himself gives them, which determines whether Moore was "practicing before the Commission." *See In the Matter of James M. Schneider, CPA*, Rel. No. 34-69922, 2013 SEC LEXIS 1932, at * 13 (July 2, 2013) (SEC Opinion). Moore "prepared materials for public companies with the understanding and expectation that such information would be included in SEC filings. This understanding and expectation is consistent with the consent described in Rule 102(f)(2)." *Jones*, 2015 U.S. Dist. LEXIS 134219, at *36-40.

11. Moore's work for Cytta and Monkey Rock involved acting as an accountant by participating in the preparation and filing of financial statements filed with the SEC. Therefore,

11

these activities, following issuance of the SEC Order, constituted "practicing before the Commission" in violation of that order, which denied Moore that privilege.

### D. Moore Violated SOX Section 105(c)(7)(B)

#### 1. Moore Associated with an Issuer While Barred from Doing So

12. On August 27, 2009, the PCAOB issued the PCAOB Order that revoked the registration of Moore's auditing firm and "barr[ed] [Moore] from being an associated person of a registered public accounting firm." SOX Section 105(c)(7)(B), 15 U.S.C. § 7215(c)(7)(B) states that it is:

> unlawful for any person that is suspended or barred from being associated with a registered public accounting firm . . . willfully to become or remain associated with any issuer in an accountancy or a financial management capacity . . . without the consent of the [PCAOB] or the Commission.

A violation of this statute is required to be treated as a violation of the Exchange Act and is subject to the same penalties as any violation of the Exchange Act. *See* SOX Section 3(b), 15 U.S.C. § 7202(b).

13. A "willful" violation of the securities laws means merely "that the person charged with the duty knows what he is doing." *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000), *quoting Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949). "Willfulness" does not require that the actor "also be aware that he is violating one of the Rules or Acts." *Id. quoting Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965).

14. For purposes of SOX, the term "issuer" means an issuer as defined in Section 3 of the Exchange Act, the securities of which are registered under Section 12 of the Exchange Act, or that is required to file reports under section 15(d). *See* SOX § 2(a)(7), 15 U.S.C. § 7201(a)(7).

15. SOX defines the term "person associated with a public accounting firm" to include an "independent contractor . . . that, in connection with the preparation or issuance of any audit report shares in the profits of, or receives compensation in any other form, from that firm." *See* SOX Section 2(a)(9), 15 U.S.C. § 7201(2)(a)(9). An "independent contractor is "[o]ne who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose

the method for accomplishing it." *Black's Law Dictionary* 785 (8th ed. 2004). *See also Spicer Accounting v. United States*, 918 F.2d 90 (9th Cir. 1990) (finding individual was not an independent contractor because the firm for which individual performed tax services provided him with the supplies and a §15.

17. Maintaining a general ledger and drafting financial statements and footnotes is evidence that an individual is functioning in an accountancy capacity. *See SEC v. Subaye*, 2014 U.S. Dist. LEXIS 132114, at *6-7 (S.D.N.Y. Sept. 18, 2014) (finding that individual who had functioned as a CFO for an issuer and performed such tasks as drafting and signing filings with the SEC violated PCAOB bar); *see also Armstrong*, 2005 SEC L 1497, at * 46-47 (practicing before the Commission as an accountant includes computing the figures and supplying the data incorporated into Commission filings); *Brown*, 878 F. Supp. 2d at 125 (practicing before the Commission as an accountant includes participating in the preparation of financial statements by, for example, creating, compiling, or editing information or data incorporate into those documents); *Prince*, 942 F. Supp. 2d at 148 (finding that defendant was "'practicing accounting' under the narrower 'creating, compiling or editing' standard of *Armstrong*"); *cf. Webster's Third New Int'l Dictionary* 13 (1986) (defining "accountancy" as "the "practice of accounting"); *Black's Law Dictionary* 21 (8th ed. 2004) defining "accounting" as "the act or a system of establishing or settling financial accounts; esp., the process of recording transactions in the financial records of a business and periodically extracting, sorting, and summarizing the recorded transactions to produce a set of financial records").

17. Monkey Rock was an issuer for purposes of SOX because its securities were registered under Section 12 of the Exchange Act. *See* SOX § 2(a)(7), 15 U.S.C. § 7201(a)(7). Moore was associated with this issuer in an accountancy capacity because he received compensation from Monkey Rock for, among other things, maintaining Monkey Rock's general ledger and drafting its quarterly and annual financial statements and footnote disclosures. Therefore, Moore violated SOX 105(c)(7)(B) because he was barred by the PCAOB Order but

13

nevertheless became and remained associated with an "issuer" in an "accountancy or financial management capacity" without the consent of either the SEC or the PCAOB.

### 2. The Current Language of SOX Section 105(c)(7)(B) Applies to Moore's Conduct

18. The current language of SOX Section 105(c)(7)(B), quoted above, reflects a clarifying amendment that was enacted with an effective date of July 22, 2010 under Section 982 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). Previously, SOX Section 105(c)(7)(B) stated:

> [It] shall be unlawful for a person that is suspended from being associated with *an issuer under this subsection* willfully to become or remain associated with any issuer in an accountancy or financial management capacity.

(emphasis added). However, the PCAOB was not empowered to suspend accountants from being associated with an issuer "under this subsection" or otherwise. Rather, it can only suspend people from being associated with public accounting firms associated with the PCAOB. Therefore, Dodd-Frank Section 982 amended SOX Section 105(c)(7)(B) by striking "an issuer under this subsection" and substituting "a registered public accounting firm under this subsection." However, the statute always contained the language prohibiting willful association "with any issuer in an accountancy or financial manager capacity" by a person barred or suspended by the PCAOB.

19. Applying that amendment to Moore's misconduct is not an impermissible retroactive application of the amendment. As the Ninth Circuit has made clear, "clarifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment." *ABKCO Music, Inc. v. Lavere*, 217 F.3d 684, 698 (9th Cir. 2000). An amendment in the face of an ambiguous statute or a dispute among the courts as to its meaning indicates that Congress is clarifying, rather than changing, the law. *ABKCO Music*, 217 F.3d at 691, *quoting Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121 (9th Cir. 1989) ("Where, as here, an act is ambiguous, an amendment thereto is an indication that it is intended to clarify, rather than change, the existing law."). For example, in *ABKCO Music*, the Ninth Circuit concluded

14

that "the 1997 amendment to § 303 of the Copyright Act was a 'statement of what [the 1909 Copyright Act] has meant all along.'" *Id.*, *quoting Beverly Community Hosp. Assn. v. Belshe*, 132 F.3d 1259, 1265 (9th Cir. 1997).[2]

### E. The SEC Is Entitled To The Relief It Seeks

#### 1. Moore Shall be Enjoined to Comply with the SEC Order

20. Section 21(e) of the Exchange Act provides that upon application of the SEC, the district courts of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and other orders commanding any person to comply with the provisions of the Exchange Act, and the rules, regulations, and orders thereunder. *See SEC v. McCarthy*, 322 F.3d 650, 656, 655 (9th Cir. 2003) (Section 21(e) "explicitly provides for district court jurisdiction over actions brought to enforce SEC-ordered sanctions… The Exchange Act does not limit or restrict what types of Commission orders may be enforced through § 21(e) other than to state that the Commission's orders must have been issued pursuant to the Exchange Act or the rules and regulations promulgated thereunder."); *see also SEC v. Vittor*, 323 F.3d 930, 935 (11th Cir. 2003), *citing Lang v. French*, 154 F.3d 217 (5th Cir. 1998) ("[S]ection 21(e)(1) expressly vests only the SEC with authority to apply to the district court for orders commanding compliance with the SEC's orders").

21. Rule 102(e) was promulgated pursuant to Section 23(a) of the Exchange Act, 15 U.S.C. § 78w(a), which authorizes the SEC to make rules necessary to implement the provisions of the Exchange Act, and for such purposes, to classify persons and prescribe requirements for them. *See Rules of Practice*, Rel. No. 34-35833, 60 FR 32738 (June 23, 1995); *Amendment to Rule 102(e)*

---

[2] One SEC administrative law judge did hold that application of the post Dodd-Frank version of SOX Section 105(c)(7)(B) would be impermissibly retroactive. *See In the Matter of Traci J. Anderson, CPA*, Rel. No. 34-77039, 2016 SEC LEXIS 380 (Feb. 2, 2016) (relying on a D.C. Circuit case involving interpretation of a Dodd-Frank Act amendment to a different provision of SOX). However, even though the ALJ concluded the amendment was not a clarifying amendment, the decision nowhere addresses how the prior language of Section 105(c)(7)(B) could have literally been enforced, because, as explained above, there is no SOX provision permitting the PCAOB to suspend a person or entity from association with issuers.

15

*of the Commission's Rules of Practice*, Rel. No. 34-40567, 63 FR 57164 (Oct. 26, 1998). Thus, the SEC Order is an "order[] thereunder" for purposes of Section 21(e). An order commanding Moore's compliance with the SEC order, which Moore has violated, is therefore appropriate. *See SEC v. Stratton Oakmont, Inc.*, 878 F. Supp. 250, 256-57 (D.D.C. 1995) (ordering defendant permanently enjoined from future violations of SEC administrative order); *see also SEC v. Brown*, 2016 U.S. Dist. LEXIS 44082 (D. Minn. Mar. 31, 2016) (where defendant violated SEC Order prohibiting him from acting as an investment advisor, entry of a permanent injunction prohibiting future violations of the SEC Order was warranted under Investment Advisers Act).

### 2. Moore Shall be Permanently Enjoined from Future Violations of SOX Section 105(c)(7)(B)

22.     Section 3(b)(1) of SOX, 15 U.S.C. § 7202(b)(1) provides in relevant part:

> A violation by any person of this Act . . . shall be treated for all purposes in the same manner as a violation of the . . .Exchange Act. . ., consistent with the provisions of this Act, and any such person shall be subject to the same penalties, and to the same extent, as for a violation of that Act. . . .

Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), provides that upon a proper showing, a permanent injunction shall be granted in an enforcement action brought by the SEC. To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations. *See SEC v. Murphy*, 626 F. 2d 633, 655 (9th Cir. 1980). Whether a likelihood of future violations exists depends upon the totality of the circumstances. *Id.* The existence of past violations, however, may give rise to an inference that there will be future violations. *See id.* Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of defendant's assurances (if any) against future violations. *SEC v. Murphy*, 626 F.2d at 655; *see also SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) (permanent injunction may be particularly appropriate where a violation was "founded on systemic wrongdoing, rather than an isolated occurrence.")

23.     A permanent injunction enjoining Moore from future violations of SOX Section

1 || 105(c)(7)(B) is appropriate.

### 3. Moore Shall Pay Disgorgement and Prejudgment Interest of $178,263.20

24. As the Ninth Circuit most recently reiterated:

> [A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010), *quoting SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998).

25. In contrast to damages, which are designed to compensate fraud victims, disgorgement forces a defendant to surrender his unjust enrichment. *See SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). By preventing unjust enrichment, disgorgement eliminates the incentive for violating the law. *Id.* at 1491, 1493; *see also SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1113 (9th Cir. 2006), *SEC v. First Pacific Bancorp*, 142 F.3d at 1191. "The amount of disgorgement should include all gains flowing from the illegal activities." *See SEC v. Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. JT Wallenbrock*, 440 F.3d at 1114.

26. The SEC need only present evidence of a "reasonable approximation" of the defendant's ill-gotten gains. *See SEC v. Platforms Wireless*, 617 F.3d at 1096; *SEC v. JT Wallenbrock*, 440 F.3d at 1113-14. Once such evidence has been presented by the SEC, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *SEC v. Platforms Wireless,* 617 F.3d at 1096, *quoting SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

27. Disgorgement has been ordered in similar cases. *See, e.g.*, *SEC v. Jones*, 2015 U.S. Dist. LEXIS 169666, at *2 & 26 (ordering defendant, who violated a Rule 102(e) order by, among other things, creating, compiling, or editing information incorporated into filings with the SEC, to disgorge $600,000); *SEC v. Taber*, 2013 U.S. Dist. LEXIS 172286, at *3, 9 (S.D.N.Y. Dec. 4, 2013) (ordering defendant, who violated a Rule 102(e) order by engaging in prohibited conduct, including

drafting and editing footnotes to financial statements, compiling and computing schedules of support for financial statement footnotes, and editing data and other information that was then incorporated into reports filed with the SEC, to disgorge $400,000).

28. Additionally, disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Cross Fin. Services*, 908 F. Supp. 718, 734 (C.D. Cal. 1995). It is appropriate for prejudgment interest to be calculated using the rate provided by 26 U.S.C. § 6621 for tax underpayments. *See SEC v. Platforms Wireless*, 617 F.3d at 1099 (affirming use of this IRS rate to calculate prejudgment interest).

29. Therefore, Moore must disgorge his ill-gotten gains of $168,612.30, together with prejudgment interest in the amount of $9,650.90, totaling $178,263.20, to ensure that he does not profit from his illegal conduct.

### 4. Moore Shall Pay a $75,000 Civil Penalty

30. As explained above, Section 3(b)(1) of SOX explicitly provides that a person who violates SOX "shall be subject to the same penalties, and to the same extent" as for a violation of the Exchange Act. 15 U.S.C. § 7202(b)(1). Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), provides that the SEC may seek civil penalties for violations of the Exchange Act. The Exchange Act provides that the amount of any civil penalty "shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 78u(d)(3)(B)(i). Section 21(d)(3)(B) further provides three different levels, or "tiers" of penalties, and sets forth the circumstances under which a penalty in each tier may be imposed.

31. A "first tier" penalty may be imposed for any violation. 15 U.S.C. § 78u(d)(3)(B)(i). A "second tier" penalty may be imposed in cases involving, among other things "reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). The maximum first tier penalty that may be assessed against Moore is $7,500 per violation, or the gross amount of pecuniary gain to such defendant as a result of the violation. 15 U.S.C. § 78u(d)(3)(B)(i). The maximum second tier

18

penalty that may be assessed against Moore is $75,000 per violation or the gross amount of pecuniary gain to the defendant. 15 U.S.C. § 78u(d)(3)(B)(ii).

32. Civil penalties are meant to punish the individual wrongdoer and to deter him and others from future securities law violations. *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998). *See also SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D.N.C. 2006), *citing SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (Congress enacted civil penalty provisions to achieve the dual goals of punishment of the individual violator and deterrence of future violations.) The deterrence of securities law violations through the imposition of monetary sanctions serves such important goals as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry. *See SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998). Because civil penalties, like a permanent injunction, are imposed to deter the wrongdoer from similar conduct in the future, in assessing civil penalties, courts frequently apply the factors set forth in *SEC v. Murphy*. *SEC v. Wilde*, 2012 U.S. Dist. LEXIS 183252, at *45-47 (C.D. Cal. December 17, 2012); *SEC v. CMKM Diamonds*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009), *citing SEC v. Alpha Telcom, Inc.*, 187 F. Supp. 2d 1250, 1263 (D. Or. 2002).

33. The Ninth Circuit and other courts have interpreted the required element for imposition of a second tier penalty of "deliberate disregard of a regulatory requirement" to include reckless violations of statutory provisions that otherwise do not require proof of scienter. As the Ninth Circuit has explained, imposition of a second-tier penalty does require an assessment of scienter. *SEC v. M&A West Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008) (on summary judgment, district court properly determined that there was no disputed issue of fact that the defendant violated Section 5, but with regard to the court's assessment of a second tier penalty, the defendant presented sufficient evidence to create material issue of fact as to whether he acted recklessly). *See also Rapoport v. SEC*, 682 F.3d 98, 108 (D.C. Cir. 2012) (reversing and remanding SEC administrative decision, in part to determine if second tier penalties may be imposed because respondent acted in "deliberate or reckless disregard" of the broker-dealer registration requirements of Exchange Act

Section 15(a)).

34. Where a defendant is a securities or other professional, like Moore, and therefore is in a position to know of a regulatory requirement, courts have found reckless disregard of such requirements and assessed second-tier penalties. *SEC v. Matter*, 2013 U.S. Dist. LEXIS 159931, at * 20-21 (S.D.N.Y. Nov. 7, 2013), *citing SEC v. Elliott*, 2012 U.S. Dist. LEXIS 82992, at * 4 & *8 (S.D.N.Y. June 12, 2012) (finding reckless disregard when defendant passed a Series 7 broker's exam and had substantial expertise in the industry); and *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 559, 568-69 (S.D.N.Y. 2009) (finding reckless disregard when defendants were a securities trader and an investment advisor). *See also SEC v. Offill*, 2012 U.S. Dist. LEXIS 48364 (N.D. Texas April 5, 2012) (although defendant only profited $12,500 from his violations, his intentional violations were particularly egregious because he was an attorney, and was formerly an SEC attorney; second tier penalty of $120,000 was imposed with regard to five offerings); *SEC v. Pattison*, 2011 U.S. Dist. LEXIS 23427 (N.D. Cal. Feb. 23, 2011) (assessing second tier penalties against CPA who violated Exchange Act Section 13(b)(5) by knowingly falsifying records or circumventing internal controls, after jury rejected SEC's fraud allegations).

35. Moore's conduct evidences that he deliberately and recklessly disregarded a regulatory requirement when he violated the PCAOB Order, in violation of SOX Section 105(c)(7)(B). His recklessness is further evidenced by his violation of the SEC Order, and his violation of this Court's prior disgorgement order. For this reason, imposition of a second tier penalty of $75,000 against Moore is appropriate.

DATED this 18 day of April, 2017.

_____
Lloyd D. George
United States District Court